E-FILED
Wednesday, 19 July, 2006  12:21:53 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 06-10012 |
| | ) | |
| KENNETH L. BARNETT | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Before the Court is Defendant Kenneth L. Barnett ("Barnett") Motion to Suppress

evidence, including the .45 caliber Llama pistol obtained from Barnett's person and any

statement made by Barnett, on the grounds that both were the product of an unlawful search and

seizure and an unlawful arrest.  The previous ruling on Barnett's Motion to Suppress Evidence

[#10] is VACATED and Barnett's Motion to Present Additional Evidence Related to the Motion

to Suppress [#11] is GRANTED.  Additionally, for the reasons set forth below, Barnett's Motion

to Suppress Evidence [#10] is GRANTED.

## PROCEDURAL HISTORY

Defendant Kenneth L. Barnett ("Barnett") filed a Motion to Suppress Physical Evidence,

including a .45 caliber Llama pistol obtained from Barnett and any statements made by Barnett,

on the grounds that both were the product of an unlawful search and seizure and an unlawful

arrest.  The Court initially held a hearing on the Motion to Suppress on April 25, 2006.  At the

hearing, the Court heard two police officers testify that they saw what they believed to be the

outline of a gun through Barnett's sweat jacket and conducted a pat down for officer safety.  The

1

officers explained that Barnett's fitted clothing allowed them to see the outline of a gun in his waistband.  The Court found credible the testimony of the officers with respect to the "bulge" in the waistband and the size of the sweat suit.  Accordingly, the Court denied Barnett's Motion to Suppress Physical Evidence.

Barnett subsequently filed a Motion to Present Additional Evidence Related to Motion to Suppress.  The motion was based on Barnett's belief that the unusual size and "bagginess" of the sweat suit would have made it impossible for the officers to observe a gun in his waistband. After the first hearing, Barnett informed his attorney that he had borrowed the sweat suit he wore on the night of his arrest from his 400 pound cousin.  As a result, Barnett's attorney filed the Motion to Present Additional Evidence Related to Motion to Suppress.  Barnett asked the Court to allow him to appear in court dressed in the sweat suit and to reconsider the police officers' testimony in light of this additional evidence.  The Court granted Barnett's Motion to Present Additional Evidence and conducted a supplemental hearing on May 24, 2006, at which Barnett appeared before the Court in the sweat suit he wore on the night of his arrest.  In addition, a supplemental hearing occurred on June 2, 2006, to allow for Barnett to be weighed and to receive further testimony from the arresting officers.

In light of the submission of this supplemental evidence and Barnett's courtroom demonstration, the Court vacates its previous decision to deny Barnett's Motion to Suppress Physical Evidence and grants Barnett's Motion to Present Additional Evidence Related to Motion to Suppress.  This order follows.

# BACKGROUND [1]

Officer Justin Sinks and Officer Shannon Parnell were on routine patrol on January 2, 2006, in Peoria, Illinois.  At the time, Officer Sinks had worked as a Peoria police officer for three months and was in the police training program at the time in question; Officer Parnell, with approximately 15 years of experience as a police officer, acted as the senior officer or "cover officer."

The officers testified that they first observed a man, later identified as Barnett, from a marked squad car in a parking lot on the corner of Lincoln and Laramie in Peoria, Illinois.  The businesses in the vicinity, which included a CVS pharmacy, a gas station, and the Chicken, Ribs, & More restaurant, appeared closed or preparing to close.  The parking lot was dark as there were no interior or exterior lights shining from the businesses, with the exception of a few overhead lights at the gas station.  There was no exterior lighting in the parking lot, and there were no vehicles in the parking lot.  Despite these lighting conditions, the two officers testified that they first observed Barnett in the vicinity of the Chicken, Ribs, & More restaurant and that they watched Barnett walk through the parking lot in the direction of the squad car.  Officer Sinks stated that he drove toward Barnett at a "snail's pace" in the squad car as Barnett continued walking toward the car.  Officer Sinks stopped the car when they were in the center of the gas station parking lot and roughly five to ten feet from Barnett.  Officer Parnell testified that Barnett appeared "nervous, startled, and walked in a hurried manner" when he first observed the squad car.  Officer Sinks informed Officer Parnell that he was going to conduct an investigative stop on

---

[1] The following summarizes the testimony given at the initial hearing on April 25, 2006, and the two supplemental hearings on May 24, 2006 and June 2, 2006.

the grounds that the business was closed, Barnett's "startled" reaction and "hurried manner," and concerns that Barnett might have burglarized the restaurant, although there were no reports of a burglary in the area either prior to or during the encounter. Though Officer Sinks admitted that his suspicion of a burglary was a "hunch," Officer Parnell characterized the investigatory stop as "just good police work." The officers got out of the car and Officer Sinks approached Barnett. Officer Parnell, as "cover officer," stood a couple of feet behind Officer Sinks but within earshot distance. Officer Sinks approached Barnett and engaged Barnett in "small talk" that lasted no longer than five minutes to determine who Barnett was and why he was in the area. Officer Sinks reported that he had never seen Barnett prior to this encounter. Barnett informed Officer Sinks that he worked at the Chicken, Ribs & More restaurant and had just closed the restaurant for the evening. During the discussion, the officers testified that Barnett appeared nervous, sweating despite the 30 degree weather, and reluctant to talk. However, the officers admitted that Barnett was non-threatening, "very cordial, very nice [and] respectful with [them]." Officer Sinks asked for Barnett's identification. The officer presumed that Barnett lived in Peoria since he worked in the area and gave a local address as his destination; however, Barnett's identification listed a Galesburg address as his residence.

The respective testimonies of Barnett and the officers differ with respect to the events that followed. The officers testified that, as Barnett reached into his pocket to retrieve his identification, they observed what they believed to be the outline of a gun covered by Barnett's sweat jacket. The gun was allegedly tucked in the left side of Barnett's waistband. Officer Sinks reported that Barnett was wearing a "gold, velvet type, really soft material" sweat suit that "basically hung on him" and that "since the shirt was fairly tight, it would have showed nothing"

4

if there had not been a gun.  Similarly, Officer Parnell confirmed that the sweat suit "fit him," was "not baggy per se" and was a "regular clothing sweat suit."  Additionally, Officer Sinks admitted that, prior to the time Barnett reached into his pocket, he had no specific reason to believe Barnett was armed.

After observing what he believed to be the outline of a gun, Officer Sinks asked Barnett to consent to a pat down.  Officer Sinks could not remember the numbers of times that he asked Barnett to consent to the search; however, he recalled that Barnett did not want the officers to pat him down.  At the first hearing, Officer Sinks testified that the bulge:

> drew a little red flag in my head....I then asked Mr. Barnett that I needed to pat him
> down, asked him if he had anything illegal.  He stated that he didn't want me patting
> him down.  He said his lawyer told him not to let me pat him down. I told him I
> needed to pat him down for officer safety, make sure he had nothing illegal or nothing
> on him he was supposed to.

(Tr. 10)  At the second supplemental hearing, Officer Sinks reported that when observed what he believed to be a handgun he:

> asked him if he had anything illegal on him...He said, 'No, man, no.'  I said, 'Well,
> then is it okay if I pat you down, make sure you ain't got nothing on you?'  After I
> had already seen the bulge.  At this point, he says, you know, 'no,' doesn't want me
> to pat him down.  Red flags are going off left and right in my head and I asked him
> again and he kept saying 'no' a second time.  He said, 'My lawyer said he don't want
> me–you know, don't let the police pat me down.'

(Tr. 74-5)  Officer Sinks waited for the arrival of a back up officer, Officer Curry, "because of the lateness since [he] observed what [he] believed to be a handgun."  He testified that "[b]asically simultaneously when the other officer arrived, we said 'We have to pat you down.' And as soon as we said that, [Barnett] said, 'Yeah, I got a gun on me.'"  (Tr. 11)  Officer Sinks reported that the pat down revealed 16 grams of marijuana in the left side front pocket and a loaded Llama

5

brand .45 caliber semiautomatic gun that corresponded with the outline of the gun that the officers had observed in Barnett's waistband.  The officer's took Barnett into custody and read him his *Miranda* rights.

Contrary to the police officers' testimony, Barnett testified at the supplemental hearing that, as he observed the officers approach him in the squad car, he removed his identification from his pocket.  Accordingly, Barnett testified that he did not reach into his pant pocket during his interaction with the police officers.  As the officer walked toward him, Barnett showed the officer the store keys and explained that he had just closed the restaurant.  The officer shined a flashlight at Barnett and attempted to speak with him.  Barnett informed the officer that he was tired and requested to go home.  The officer responded, "No, I want to search you first."  Barnett told the officer that it was not "necessary" for him to conduct a search.  The officer asked for Barnett's identification and  returned with it to the squad car as Barnett stood alone.[2]  The officer  returned from the squad car with his identification and said to him,  "I don't mind about the drugs that you have on you, but where's the pistol?"  Barnett told the officer that he did not have a pistol on him. At that point, additional officers appeared on the scene and Officer Parnell grabbed Barnett's arm. Barnett testified that he then told the officer that he had a gun on his person because he was concerned that the officer would hurt himself during the pat down.  The officer proceeded to pat down Barnett and discovered the gun.

In addition to the hearing testimony, a box from the county jail containing the sweat suit Barnett was wearing when arrested was delivered to open court.  Barnett appeared before the

---

[2] Although Barnett testified that the officers returned to the squad car with his identification and "checked it," neither officer reported running a check on Barnett's identification.

Court in the sweat suit he wore on the night of his arrest.  The Court observed that the sweat suit appeared to be made of a heavy, soft sweatshirt material and was dull in color.  Moreover, when Barnett appeared before the Court dressed in the sweat suit, the fit appeared grossly oversized. Barnett testified that he had borrowed the sweat suit from his 400 pound cousin and that he was the same weight as the night of his arrest.  He further testified that the outer sweat jacket was unzipped, his inner T-shirt was untucked, and the gun was secured in his underwear on the night of his arrest.  Conversely, Officer Parnell testified that Barnett was "significantly heavier in weight" on the night of his arrest and that Barnett's sweat jacket was zipped, the inner T-shirt was tucked in, and the gun was positioned in his waistband.  He also testified that the sweat suit material was "a nylon type of polyester jogging material" and "a lot tighter around the waist area and through the shoulder area."  Though Officer Parnell raised doubts whether it was the same sweat suit due to a variance in the material, the color, and the oversized fit of the sweat suit, he confirmed that the clothing was retrieved from the county jail as the clothing obtained from Barnett at the time of his arrest.  Furthermore, Officer Couve, who initially retrieved the clothing from the jail, confirmed that the clothes were supplied to him as the outfit Barnett wore at the time of his arrest.

At the first supplemental hearing, the Court had the opportunity to observe the gun (unloaded) in Barnett's waistband with both the inner T-shirt tucked and untucked.  The pants appeared as though they would fall off had Barnett not secured them with his hand. The demonstration raised serious question whether a gun could have been secured and a bulge detected in the waistband of the grossly oversized sweat suit, regardless of whether the gun was secured in Barnett's pants with the shirt tucked in his pants or in his underwear covered by an

7

untucked T-shirt and sweat shirt.  The Court rescheduled an additional supplemental hearing to allow for Barnett to be weighed and for further testimony.

The second supplemental hearing focused on the alleged variances in both the sweat suit and Barnett's weight.  Officer Sinks testified that the sweat jacket was zipped up approximately three-fourths of the way and that the inner T-shirt was tucked in on the night of the arrest. Contrary to his earlier testimony that the suit was a "velvet type, really soft material," Officer Sinks reported that the seemingly cotton sweat suit appeared dull compared to the "shiny, polyester type" sweat suit Barnett wore on the night of his arrest.  Officer Sinks could not say with certainty that the sweat suit was the same Barnett wore on the night in question.  He further testified that Barnett appeared "considerably skinnier" and that there was a "noticeable difference" in his entire face and body.

The testimony of Officer John Couve confirmed that, contrary to the defendant's assertion, Barnett has lost weight since the night of his arrest.  The booking sheet completed at the time of the arrest reported Barnett's weight as 234 pounds.  Officer Couve testified that the nurse at the Peoria county jail actually weighed Barnett approximately four days after his arrest.  A computer print out and the nurse's handwritten notes indicate that Barnett weighed 223 on approximately January 6, 2006.  Officer Couve testified that Barnett was re-weighed on May 24, 2006, using the same scale and weighed 200 pounds.  Barnett denies being weighed immediately after his arrest.

With respect to the officers' allegations that the sweat suit in court appeared to be of a different material than that worn by the defendant on the night of the arrest,  Barnett attributed the variance to fact that the clothes were laundered at the county jail.  He verified that the sweat suit

8

was the same as the one he wore on the night of his arrest.  He suggested that the clothing

material had a sheen on the night of his arrest because he had ironed the clothes with heavy starch

and that this sheen was lost when the clothes were laundered at the county jail.  He also indicated

that the clothes appeared to have shrunk in the wash and testified that he may have not been

aware of his weight loss because of the large prison jumpsuit.

## DISCUSSION

Barnett asks that the Court suppress the evidence on the grounds that the police officers

violated his 4th Amendment right to be free from unreasonable search and seizure when the

officers stopped him and searched his person.  In response, the government argues that the

evidence should not be suppressed because the officers had reasonable suspicion to "stop and

frisk" Barnett or, in the alternative, that Barnett's admission that he possessed a gun provided

probable cause to search.

I.. _Reasonable suspicion to conduct the Terry stop_

Barnett argues that the police officers violated his 4th Amendment right to be free from

unreasonable search and seizure when they stopped him on the night of January 2, 2006.

Therefore, the Court must determine whether the encounter between Barnett and the officers was

a permissible investigatory stop.  The Seventh Circuit has recognized two potential stages to an

investigatory stop: (1) the actual stop and (2) the protective pat down search.  United States v.

Brown, 232 F.3d 589, 592 (7th Circuit 2000).  The initial detention is justified so long as the

police officer had reasonable suspicion supported by "specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant the intrusion."  Terry v.

Ohio, 392 U.S. 1, 21 (1968). Though reasonable suspicion is a "quantum of proof less demanding

than probable cause," it requires "some minimal level of objective justification for making the stop." United States v. Quinn, 83 F.3d 917, 921 (7th Cir. 1996) (internal citations and quotations omitted).  An analysis of reasonable suspicion involves a consideration of the "totality of the circumstances," including the experience of the officer and the behavior and characteristics of the suspect, known to the officer at the time of the encounter.  United States  v. Odum, 72 F.3d 1279, 1284 (7th Cir. 1995) (internal citations omitted).  The central issue is whether the police officers' conduct was reasonable given their suspicions and the surrounding circumstances.  United States v. Tilmon, 19 F.3d 1224, 1224 (7th Cir. 1994).

The Court must first consider whether the officers had reasonable suspicion supported by "specific and articulable facts" to justify the *Terry* stop.  Officer Sinks and Officer Parnell both testified that the purpose of the investigative stop was to determine if Barnett had burglarized the Chicken, Ribs, & More restaurant.  Though Officer Sinks responded affirmatively when asked if his suspicion of a burglary were a "hunch," he nonetheless articulated a series of facts to support his conclusion.  Moreover, Officer Parnell, with approximately 15 years of service as a police officer, characterized the stop as "just good police work."  Both officers justified the investigatory stop by pointing to the facts that the businesses in the vicinity were closed or preparing to close, the business from which Barnett appeared to come was closed, and that Barnett "appeared nervous, startled, and walked in a hurried manner" when he first observed the marked squad car. The officers' suspicions increased during the encounter as Barnett appeared to be sweating despite the 30 degree temperature, was "very nervous," and seemed "real reluctant to speak to [Officer Sinks] even with small talk.."

The Court finds that the officers had reasonable suspicion supported by "articulable facts

that 'criminal activity may be afoot.'"  <u>United States v. Sokolow</u>, 490 U.S 1, 7 (1989).  The

officers first observed Barnett in the vicinity of a closed business in a vacant parking lot.

Moreover, the officers were alerted to Barnett's nervousness and apparent reluctance to speak

with them.  A reasonable person would find  Barnett's behavior extraordinary for a man returning

home from work.  Indeed, Barnett's nervousness assumes a questionable character when assessed

in the context of a dark, vacant business area.  *See* <u>Terry</u>, 392 U.S. at 24 (recognizing a "series of

acts, each of them perhaps innocent in itself, but which together warranted further investigation").

Therefore, the Court finds that the police officer "formulated certain common-sense conclusions

about human behavior" in conducting a permissible *Terry* stop. <u>Sokolow,</u> 490 U.S. at 8 (internal

citations and quotations omitted).  After determining that the *Terry* stop was supported by

reasonable suspicion, the Court must consider whether the police officers had probable cause or,

in the alternative,  reasonable suspicion to justify the search of Barnett's person.

II. <u>*Barnett's statement as grounds for probable cause to search*</u>

The government argues that the police had probable cause to search after Barnett admitted

that he had a gun on his person.  The government is correct in asserting that a suspect's voluntary

admissions are relevant in determining whether probable cause exists.  *See* <u>United States v. Finke</u>,

85 F.3d 1275, 1282 (stating that a police officer's reasonable suspicions became probable cause to

search a vehicle where the driver admitted there was "pot" in the car, a pat-down search revealed

a roach clip, and a canine united alerted to drugs in the trunk).  In this case, Barnett admitted to

the officers that he had a gun on his person before the officers conducted a search.  Clearly,

Barnett's admission, if voluntarily, provided the police officers with probable cause to search.

Accordingly, the Court must determine if Barnett's admission was voluntary.

Voluntary statements that "are the product of [an] illegal detention and not the result of an independent act of free will" are not admissible into evidence.  United States v. Royer, 460 US 491, 501 (1983) (internal citations omitted).  The Seventh Circuit states that a voluntary statement is one that "in the totality of the circumstances is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendants's free will" United States v. Dillon, 150 F.3d 754, 757 (7th Cir. 1998).  *See also* Schneckloth v. Bustamonte, 412 U.S. 218, 233 (1973) (stating that "if under all circumstances it has appeared that the consent was not given voluntarily— that it was coerced by threat or force, or granted only in submission to a claim of lawful authority— then we have found consent invalid and the search unreasonable").  A showing of  "coercive police activity" is necessary to a finding of an involuntary confession. Dillon, 150 F.3d at 757 (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).  The test for voluntariness is: "Is the confession the product of an essentially free and unconstrained choice by the maker?"  Schneckloth, 412 US at 225.

Though statements induced by police inquiry or action are not necessarily involuntary, the "totality of the circumstances" raises doubt whether Barnett's admission that he possessed a gun was a "free and unconstrained" decision.  In cases of coerced consent, the Seventh Circuit has found that an empty threat to obtain a search warrant may render the consent to search involuntary.  United States v. Duncan, 957 F.2d 499, 502 (7th Cir. 1992) (internal citations omitted).  In determining whether the consent was coerced, the circumstances surrounding the consent must account for "subtly coercive police questions" and the "possibly vulnerable subjective state of the person who consents." Schneckloth, 412 U.S. F.2d at 229.  Accordingly, an extension of these principles to the instant case suggests that the threat of or, as the facts suggest,

12

the certainty of a pat down unsupported by probable cause may render Barnett's admission involuntary.

The Court finds that the certainty of an imminent pat down overcame Barnett's free will. The testimony of Officer Sinks and Barnett was that Barnett initially denied having a gun on his person.  Moreover, Officer Sinks admitted that Barnett did not want the officer to pat him down In fact, Barnett refused the officer's request for a pat down more than once.  Though the respective testimonies of Barnett and Officer Sinks differ with respect to the events immediately prior to his admission and the pat down, both accounts suggest that a search without consent was certain to occur.  The testimony of Barnett and the officers indicate that Barnett refused the officer's request to a pat down, that at some point the officers followed the request with a declarative statement that a pat down was going to take place, and that Barnett's admission occurred either simultaneously or immediately after he was told that a pat down would occur.  Specifically, Officer Sinks testified that "[b]asically simultaneously when the other officer arrived, we said, 'We have to pat you down.' And as soon as we said that, [Barnett] said, 'Yeah, I got a gun on me." Also, Barnett testified that, immediately prior to his admission, more cars arrived on the scene and Officer Parnell grabbed his arm.  The timing of the admission immediately after the officer's declarative statement, the officers' awareness that Barnett did not want to be searched, and the arrival of additional officers indicate that Barnett's statement was not voluntary.  The totality of the circumstances suggests that Barnett's free will was overcome by the officers' activity and statements at the time.  Accordingly, the Court finds that Barnett's statement cannot be used to provide the officers with probable cause to justify the search.

III. _Reasonable suspicion to search_

Even though the Court finds that the defendant's admission that he had a gun cannot be used to provide probable cause for the search, the search would still be valid if the officers had reasonable suspicion to support a *Terry* frisk.  A protective pat down is justified so long as the police officer is "able to point to specific and articulable facts that the individual is armed and presents a risk to the officer or to others."  Brown, 232 F.3d at 592 (internal citations and quotations omitted).  A police officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in believing his safety or that of another was in danger." Terry, 392 U.S. at  27 (1968).

In justifying the *Terry* frisk, the officers testified that the bulge in Barnett's waistband raised their suspicions that Barnett was armed and dangerous.  The Court must consider this testimony in light of  Barnett's courtroom appearance in the grossly oversized sweat suit.  During Barnett's courtroom demonstration, the Court observed that the sweat suit was not form fitting at all, even accounting for Barnett's weight loss of more than 20 pounds.  The size of the sweat suit makes it highly unlikely that the officers could have seen the outline of the butt of a gun.  It is certainly possible that the officers did in fact see the outline of a gun.  However, the Court finds that the officers' testimony with respect to the observed outline of the gun is not sufficiently credible to satisfy the government's burden of preponderance of the evidence.  Therefore, the Court will not consider this evidence as justification for the *Terry* frisk.

Even though the Court finds that the officers' allegations of an observed bulge cannot justify the pat down, the search may still have been lawful if other facts surrounding the incident provided the officers with reasonable suspicion. *See* Brown, 232 F.3d at 594 (stating that courts "look to the record as a whole to determine what facts were known to the officer and then

14

consider whether a reasonable officer in those circumstances would have been suspicious"
(*quoting* United States v. McKie, 951 F.3d 399, 402 (D.C. Cir. 1991) (per curiam).  The officers'
justifications for the *Terry* stop, including Barnett's nervous behavior and the surrounding
circumstances, are relevant to an analysis of the *Terry* frisk.   The police officers reasonably
would have recognized both the location as a high crime area and the dangerousness of a possible
burglary.  *See* Quinn, 83 F.3d at 922 (stating that a high crime area may be factored as part of the
totality of the circumstances); Terry, 392 U.S. at 29 (recognizing a reasonable presumption that a
daylight robbery involves the use of a weapon).

Though the facts support a generalized suspicion of danger, the evidence does not show a
particularized suspicion that Barnett was armed and dangerous.  The officers were not acting on
informant information or reports of criminal activity.  *See* United States v. Mitchell, 256 F.3d
734, 738 (7th Cir. 2001) (recognizing a police report of guns shots as a factor in the totality if the
circumstances).  Moreover, the officers had no prior experience with Barnett prior to the
encounter on the night of their arrest.  *See generally* Id. (discussing in depth the officer's
knowledge of the suspect as grounds for reasonable suspicion); *but see generally*  Terry, 392 U.S
1 (1968) (stating that officer had reasonable suspicion to search individuals previously unknown
to him after he observe the individuals engage in suspicious behavior for 10 to 12 minutes).
Though the officers may have reasonably inferred that Barnett had a criminal past from his
refusal to allow a pat down per the advice of his attorney, the record does not indicate that the
officers asked Barnett about his criminal history or ran a formal identification check.

Additionally, although the court recognizes that Barnett's statement regarding his lawyer's
advice not to permit a search and his nervous demeanor may have put the officers on alert, the

15

facts in total do not add up to a finding of reasonable suspicion. The record indicates that Barnett fully cooperated with the police officers up to the point when he exercised his right to refuse the pat down. Indeed, Officer Parnell described Barnett as "very cordial, very nice, respectful with us." Similarly, Officer Sinks described Barnett as "very reluctant but nice," generally cooperative, and non-threatening during the encounter. Even more telling, Officer Sinks confirmed that he had no reason to suspect Barnett was armed until after he allegedly observed the outline of the gun. Though the Court sympathizes with a police officer's immediate need to neutralize danger posed in the course of duty, the evidence in this case does not provide adequate specific and articulable facts to support a reasonable suspicion that Barnett was armed and dangerous at the time.

## CONCLUSION

As stated previously, the previous ruling on Barnett's Motion to Suppress Evidence [#10] is VACATED and Barnett's Motion to Present Additional Evidence Related to Motion to Suppress [#11] is GRANTED. Additionally, for the reasons set forth above, Barnett's Motion to Suppress Evidence [#10] is GRANTED.

ENTERED this 18th day of July, 2006.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge

16

17